# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TAYLOR AMBROSIO, on behalf of herself, on behalf of her minor children Liam Quillen and Levi Quillen, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NORTHWELL HEALTH, INC., and PERRY JOHNSON & ASSOCIATES, INC.,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Taylor Ambrosio ("Ambrosio"), on behalf of herself and her minor children, Liam Quillen and Levi Quillen (collectively "Plaintiffs"), by and through her attorneys of record, upon personal knowledge as to her own acts and experiences, upon the investigation of counsel, and upon information and belief as to all other matters, brings this class action complaint against defendants Northwell Health, Inc. ("Northwell") and Perry Johnson & Associates ("PJ&A") (collectively referred to as "Defendants"), and alleges as follows:

## INTRODUCTION

1.      Plaintiff Ambrosio brings this class action on behalf of a Class, as defined below, against Defendants for their failure to properly secure and safeguard Plaintiffs' and Class Members' protected personal health information stored within Defendants' information networks and servers, including, without limitation, "protected health information" ("PHI"),[1] and

---

[1] Protected Health Information ("PHI") is a category of information that refers to an individual's medical records and history, which is protected under the Health Insurance Portability and Accountability Act. Inter alia, PHI includes test results, procedure descriptions, diagnoses, personal or family medical histories, and data points applied to a set of demographic information for a particular patient. PHI is inclusive of and incorporates personally identifiable information.

"personally identifiable information" ("PII"),[2] as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (collectively, PHI and PII are also referred to therein as "Private Information").

2.      Defendant Northwell is a large healthcare provider with 21 hospitals, 890 outpatient facilities, and over 85,000 employees. In the course of providing healthcare services throughout its systems, Northwell collected, maintained, and stored Plaintiffs' and Class Members' PII and PHI. To facilitate the healthcare-related services Plaintiffs and Class Members requested or received, Northwell knew, at all times material, that it was collecting, and responsible for the security of sensitive data, including Plaintiffs' and Class Members' PII and PHI.

3.      Defendant PJ&A is a medical transcription firm that services medical providers across the country. On information and belief, Defendant PJ&A contracted to service Defendant Northwell, and to collect, maintain, and store Plaintiffs' and Class Members' PII and PHI.

4.      Plaintiffs seek to hold Defendants responsible for the harms they caused and will continue to cause Plaintiffs and other similarly situated persons by virtue of a massive and preventable cyberattack that Defendants discovered no later than May 2, 2023, by which cybercriminals infiltrated the electronic data storage networks and systems of Defendant PJ&A, in or on which the Private Information of Plaintiffs and Members of the Class was stored (the "Data Breach"). Defendants collected this Private Information from Plaintiffs and the Class and Defendants were responsible for securing said Private Information. Plaintiffs further seek to hold Defendants responsible for not ensuring that PII and PHI, as defined by HIPAA Privacy Rule (45 CFR, Parts 160 and 164(A) and (E)), and respecting which Defendants were duty bound to protect pursuant to the HIPAA Security Rule (45 CFR, Parts 160 and 164(A) and (C)), was maintained in a manner consistent with industry standards, and other relevant standards.

---

[2] Personally identifiable information ("PII") generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on its face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers).

5.      HIPAA, in general, applies to healthcare providers, health plans/insurers, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically, and sets standards for Defendants' maintenance of Plaintiffs' and Class Members' PII and PHI, including appropriate safeguards to be maintained by organizations such as Defendants' to protect the privacy of patient health information, while setting limits and conditions on the uses and disclosures that may be made of such information without express customer/patient authorization.

6.      Additionally, the so-called "HIPAA Security Rule" establishes national standards to protect individuals' electronic health information that is created, received, used, or maintained by a covered entity such as Northwell or a HIPAA Business Associate such as PJ&A. The HIPAA Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic PHI.  HIPAA provides the standard of procedure by which a medical provider must operate when collecting, storing, and maintaining the confidentiality of PHI and PII information.

7.      By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII and PHI, Defendants knowingly assumed legal and equitable duties to those individuals, including those arising from common law principles.

8.      Nonetheless, Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take, implement, and ensure adequate and reasonable measures regarding the safeguarding of Plaintiffs' and Class Members' PII and PHI, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data. As a result and upon information and belief, the PII and PHI of Plaintiffs and Class Members has been compromised and they have been and shall be damaged through access by and disclosure to an unknown and unauthorized entity—an undoubtedly nefarious third party that seeks to profit off this disclosure by defrauding Plaintiffs and Class Members in the future.  In

addition, Plaintiffs and Class Members, who have a continuing interest in ensuring that their information is safe, are entitled to injunctive and other equitable relief.

## PARTIES

*Plaintiff*

9.      Plaintiff Taylor Ambrosio is, and at all relevant times was, a resident of Nassau County, New York.  Plaintiff Ambrosio is and has been a patient of Northwell. Since receiving notice of the Data Breach, Plaintiff has been forced to spend time monitoring personal financial accounts for signs of fraudulent transactions or activity and anticipates that she will continue to have to do so.

10.      Plaintiff Levi Quillen is a minor, a patient of Northwell, and a resident of Nassau County, New York. Plaintiff Ambrosio, who is Levi Quillen's parent and guardian, received a notice of the Data Breach indicating that Levi Quillen's PHI and PII had been accessed and exfiltrated in the Data Breach, subjecting him to a continuing threat of identity theft and/or financial fraud.

11.      Plaintiff Liam Quillen is a minor, a patient of Northwell, and a resident of Nassau County, New York. Plaintiff Ambrosio, who is Liam Quillen's parent and guardian, received a notice of the Data Breach indicating that Liam Quillen's PHI and PII had been accessed and exfiltrated in the Data Breach, subjecting him to a continuing threat of identity theft and/or financial fraud.

*Defendants*

12.      Defendant Northwell is a healthcare organization comprised of more than 21 hospitals and 890 outpatient facilities, and employs over 85,000 employees. The Company provides occupational health services, physical therapy, urgent care, and other health services and employs approximately 85,000 people. Defendant Northwell maintains its headquarters at 2000 Marcus Avenue, New Hyde Park, New York 11042.

13.      Defendant PJ&A is a Nevada corporation, and maintains its headquarters at 755 W. Big Beaver Road, No. 1300, Troy, Michigan 48084. As part of its business, PJ&A collects,

maintains, and services the Private Information that it receives from Defendant Northwell and its patients. On information and belief, PJ&A is a HIPAA Business Associate.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d), because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interests and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendants to establish minimal diversity.

15.     This Court has general personal jurisdiction over Defendants because Defendant Northwell is a corporation of New York with a principal place of business in this district and Defendant PJ&A has minimum contacts with New York, as it conducts substantial business in or from this district.

16.     This Court is the proper venue for this action because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendants conduct a substantial part of their business within this District.

## FACTUAL BACKGROUND

***The Data Breach***

17.     Upon information and belief, on May 2, 2023, Defendants discovered that its data had been accessed by cybercriminals.[3]

18.     From March 27 to May 2, 2023, cybercriminals accessed Defendant PJ&A's servers and exfiltrated names, social security numbers, dates of birth, addresses, medical record numbers, hospital account numbers, admission diagnoses, and dates and times of service.

19.     Despite learning of the Data Breach in May 2023, Defendants failed to notify anyone until October 31, 2023, six months after the incident.

___
[3] https://www.idstrong.com/sentinel/dhs-confirms-nearly-9-million-patients-exposed-by-pja/ (Last accessed January 31, 2024).

20.     On or about October 31, 2023, PJ&A began providing notice to Plaintiffs and Class Members of the Data Breach (the "Notice of Data Breach"), including disclosures similar to those noted above.

21.     This "disclosure," which came more than six months after Defendants discovered the Data Breach, amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

22.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, and failed to adhere to the standard of care required of healthcare related business and services, ultimately leading to and causing the exposure of Private Information.

23.     Upon information and belief, the exfiltrated data was not encrypted or hashed, allowing nefarious actors easy access to the data.

24.     Additionally, Defendants failed to explain why they were unable to detect the Data Breach for two months, identify the remedial measures undertaken once knowledge of the breach occurred, and why Defendants did not notify Plaintiffs and Class Members in a timely manner once Defendants discovered the breach.

25.     Upon information and belief, Defendants continue to inadequately secure or maintain Plaintiffs' PHI and PII, as well as that of all other Class Members.

26.     This cyberattack is notable for both the scale of individuals affected, as well as the scale of data affected. Media reports note this as "one of the worst medical-related data breaches in recent times.[4]"

---

[4] https://techcrunch.com/2023/11/15/9-million-patients-had-data-stolen-after-us-medical-transcription-firm-hacked/
(Last accessed January 31, 2024).

27.     Defendant Northwell initially announced that 3.89 million patients had been affected, before retracting this number.[5]

28.     At this time, the New York Attorney General's Office has announced that it that approximately four million New Yorkers have been involved due to this Data Breach.[6]

29.     Beyond acknowledging the Data Breach – albeit inadequately – Defendants' therapeutic steps are inadequate.  Defendants have failed to adequately compensate Plaintiffs and members of the Class.  Defendants have failed to adequately address the multiple years of identity theft and financial fraud that Data Breach victims face.  As a consequence of the Data Breach, Plaintiffs and Class Members will be forced to pay out-of-pocket for necessary identifying monitoring services for years thereafter.

*As a Healthcare Provider, Northwell is Obliged to Preserve and Protect PHI and PII*

30.     Plaintiffs and Class Members are current or former patients of Northwell who reside in New York and obtained healthcare service(s) from Defendant.

31.     As a consequence of securing or receiving services from Northwell, Plaintiffs and Class Members were required to provide sensitive and confidential Private Information, including their names and Social Security Numbers, and other sensitive information.

32.     Defendants were entrusted with the Private Information for its millions of patients. Northwell maintains a Notice of Privacy Practices setting forth its obligations pursuant to HIPAA to safeguard and protect the confidentiality of consumers Private Information (the "HIPAA Policy").[7]

33.     In its HIPAA Policy, Northwell assured Plaintiffs and Class Members that "[w]e understand that medical information about the health of our patients is personal. We are committed

---

[5] https://www.audacy.com/1010wins/news/local/northwell-health-vendor-cyberattack-patient-data-breach (Last accessed January 31, 2024).

[6] https://ag.ny.gov/press-release/2023/attorney-general-james-warns-new-yorkers-impacted-medical-companys-data-breach (Last accessed January 31, 2024).

[7] https://www.northwell.edu/about-northwell/commitment-to-excellence/protecting-patient-privacy (last visited on February 1, 2024.)

to protecting patients' personal medical information."[8] Northwell further acknowledge that it "is required by law" to "[m]ake sure medical information that identifies a patient is kept private" and "[n]otify affected individuals following a breach of unsecured protected health information."[9]

34.    Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access. The information collected by Defendants included the Private Information of Plaintiffs and Class Members.

35.    Plaintiffs and Class Members relied on the sophistication of Defendants to keep their Private Information confidential and securely maintained, to use this information for necessary healthcare purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members, who value the confidentiality of their Private Information and demand security to safeguard their Private Information, took reasonable steps to maintain the confidentiality of their PII/PHI.

36.    At all times material, Defendants were under a duty to adopt and implement reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties.  To that end, Defendants were reposed with a legal duty created by HIPAA, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

37.    By obtaining, collecting, using, and storing Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties, and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.  And given the highly sensitive nature of the PII and PHI it possessed and

---

[8] *Id.*

[9] *Id.*

the sensitivity of the medical and health services it provides, Defendants had a duty to safeguard, protect, and encrypt Plaintiffs' and Class Members' PII and PHI.

38.    Defendants retain and store this information and derive a substantial economic benefit from the Private Information that they collects. But for the collection of Plaintiffs' and Class Members' Private Information, Defendants would be unable to perform their services.

39.    Upon information and belief, Defendants made promises to Plaintiffs and all Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

40.    Defendants' failure to adequately safeguard the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

41.    Defendants were not permitted to disclose Plaintiffs' and Class Members' Private Information for any reason that would apply in this situation.

42.    Defendants were obliged by contract, industry standards, common law, and promises and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and protect it from unauthorized access and disclosure.

43.    Plaintiffs and Class Members had a reasonable expectation and mutual understanding that Defendants would comply with its obligations to keep the Private Information they provided confidential and secure from unauthorized access and disclosure.

44.    Defendants failed to use reasonable security procedures and practices appropriate to safeguard the sensitive, unencrypted information they were maintaining for Plaintiffs and Class Members, consequently enabling and causing the exposure of Private Information of 3.9 million individuals.

45.    Because of Defendants' negligence and misconduct in failing to keep the accessed information confidential, the unencrypted Private Information of Plaintiffs and Class Members has been expropriated by unauthorized individuals who can now exploit the PHI and PII of Plaintiffs and Class Members and use it as they please.

46.     Even though Defendants recognized no later than May 2, 2023, that Private Information had been accessed and exfiltrated, it has delayed sending written notice directly to members of the Class.

47.     Plaintiffs and Class Members now face a real, present and substantially increased risk of fraud and identity theft and have lost the benefit of the bargain they made with Defendants when receiving services.

**Data Breaches Lead to Identity Theft and Cognizable Injuries.**

48.     The PII and PHI of consumers, such as Plaintiffs and Class Members, is highly valuable and has been commoditized in recent years.

49.     Identity theft associated with data breaches is particularly pernicious due to the fact that the information is made available, and has usefulness to identity thieves, for an extended period of time after it is stolen. As a result, victims suffer both immediate and long-lasting exposure and are susceptible to further injury over the passage of time.

50.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  They must now be vigilant and continuously review their credit reports for suspected incidents of identity theft, educate themselves about security freezes, fraud alerts, and take steps to protect themselves against identity theft, which will extend indefinitely into the future.

51.     Plaintiffs and Class Members also suffer ascertainable losses in the form of opportunity costs and the time and costs reasonably incurred to remedy or mitigate the effects of the Data Breach, including:

     A.     Monitoring compromised accounts for fraudulent charges;

     B.     Canceling and reissuing credit and debit cards linked to the information in possession of Defendants;

     C.     Purchasing credit monitoring and identity theft prevention;

> D.    Addressing their inability to withdraw funds linked to compromised accounts;
>
> E.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;
>
> F.    Taking trips to banks and waiting in line to verify their identities in order to restore access to the accounts;
>
> G.    Placing freezes and alerts with credit reporting agencies;
>
> H.    Spending time on the phone with or at financial institutions to dispute fraudulent charges;
>
> I.    Contacting their financial institutions and closing or modifying financial accounts;
>
> J.    Resetting automatic billing and payment instructions from compromised credit and debit cards to new cards;
>
> K.    Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised accounts that had to be cancelled; and,
>
> L.    Closely reviewing and monitoring financial accounts and credit reports for unauthorized activity for years to come.

52.    Moreover, Plaintiffs and Class Members have an interest in ensuring that Defendants implement reasonable security measures and safeguards to maintain the integrity and confidentiality of the Private Information, including making sure that the storage of data or documents containing Private Information is not accessible by unauthorized persons, that access to such data is sufficiently protected, and that the Private Information remaining in the possession of Defendants is encrypted, fully secure, remains secure, and is not subject to future theft.

53.    As a further direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

54.     As a direct and proximate result of Defendants' wrongful actions or omissions here, resulting in the Data Breach and the unauthorized access of and disclosure or risk of exfiltration of Plaintiffs' and Class Members' Private Information, Plaintiffs and Class Members have suffered, and will continue to suffer, actual injury and harm, including, *inter alia*, (i) the resulting increased and imminent risk of future ascertainable losses, economic damages and other actual injury and harm, (ii) the opportunity cost and value of lost time they have spent or must spend to monitor their financial accounts and other accounts—for which they are entitled to compensation; and (iii) emotional distress as a result of having their Private Information accessed by unauthorized cyber-thieves in the Data Breach.

***Defendants Were Well Aware of the Threat of Cyber Theft and Exfiltration in the Healthcare Industry***

55.     Defendants were aware of the significant repercussions that would result from their failure to protect Private Information and knew, or should have known, the importance of safeguarding the Private Information entrusted to them and of the foreseeable consequences of a breach of data security.

56.     Defendants could have prevented the Data Breach by assuring that the Private Information at issue was properly secured.    Defendants' overt negligence in safeguarding Plaintiffs' and Class Members' PII and PHI is exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.    Further, as entities in the healthcare space, Defendants were on notice that companies in the healthcare industry are targets for data breaches.

57.     The healthcare industry in particular has experienced a large number of high-profile cyberattacks. Cyberattacks, generally, have become increasingly more common. In 2021, a record 715 healthcare data breaches reported, an increase of approximately 100% since 2017.[10]

---

[10] 2022 Healthcare Data Breach Report, https://www.hipaajournal.com/2022-healthcare-data-breach-report/ (last accessed January 31, 2024).

58.     This trend continued in 2022, with 707 healthcare breaches reported, still near record highs.[11] Additionally, according to the HIPAA Journal, the five largest healthcare data breaches reported in 2022 impacted the healthcare records of approximately 13.3 million people.[12] Thus, Defendants were on further notice regarding the increased risks of inadequate cybersecurity. In February 2022, the cybersecurity arm of the U.S. Department of Health and Human Services ("HHS") issued a warning to hospitals and healthcare systems about a dramatic rise in cyberattacks, including ransomware attacks, urging facilities to shore up their cyber defenses.[13] Indeed, HHS's cybersecurity arm has issued yet another warning about increased cyberattacks that urged vigilance with respect to data security.[14]

59.     In the context of data breaches, healthcare is "by far the most affected industry sector."[15] Further, cybersecurity breaches in the healthcare industry are particularly devastating, given the frequency of such breaches and the fact that healthcare providers maintain highly sensitive and detailed PII.[16]

60.     A TENABLE study analyzing publicly disclosed healthcare sector breaches from January 2020 to February 2021 reported that "records were confirmed to have been exposed in nearly 93% of the breaches."[17]

---

[11] *Id.*

[12] *Id.*

[13] Rebecca Pifer, Tenet says 'cybersecurity incident' disrupted hospital operations, HEALTHCAREDIVE (Apr. 26, 2022), https://www.healthcaredive.com/news/tenet-sayscybersecurity-incident-disrupted-hospital-operations/622692/ (last accessed January 31, 2024).

[14] *Id.* (HHS warned healthcare providers about the increased potential for attacks by a ransomware group called Hive, "[c]alling it one of the 'most active ransomware operators in the cybercriminal ecosystem,' the agency said reports have linked Hive to attacks on 355 companies within 100 days of its launch last June — nearly three a day.").

[15] Tenable Security Response Team, *Healthcare Security*, TENABLE (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last accessed January 31, 2024).

[16] *Id.*

[17] *Id.*

61.     This is such a breach of cybersecurity where highly detailed PII and PHI records maintained and collected by a healthcare entity were accessed and/or acquired by a cybercriminal.

62.     Due to the high-profile nature of these breaches, and other breaches of its kind, Defendants were and/or certainly should have been on notice and aware of such attacks occurring in the healthcare industry and, therefore, should have assumed and adequately performed the duty of preparing for such an imminent attack. This is especially true given that Defendants are large, sophisticated operations with the resources to put adequate data security protocols in place and assure the security of the data collected by them and entrusted to them by Plaintiffs and Class Members.

63.     Yet, despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect Plaintiffs' and Class Members' PII and PHI from being compromised.

***Defendants' Conduct Fails to Adhere to Industry Standards, HIPAA and HITECH Standards, and Commensurate Duties it Owed to Plaintiffs and the Class***

64.     Defendants embraced a standard of care and commensurate duty defined by HIPAA, state law and common law to safeguard the PHI and PII of Plaintiffs and Class Members data.

65.     Moreover, Plaintiffs and Class Members surrendered their highly sensitive personal data under the condition and implied promise and assurance by Defendants that they would keep such Private Information confidential and secure. Accordingly, Defendants also had an implied duty to safeguard their data, independent of any statute.

66.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI like the data Defendants left unguarded.  The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA.

These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

67.     Defendant Northwell is a covered entity pursuant to HIPAA. See 45 C.F.R. § 160.102. Defendant Northwell must therefore comply with the HIPAA Privacy Rule and Security Rule. See 45 C.F.R. Part 160 and Part 164, Subparts A through E.

68.     In the same vein, Defendant PJ&A is a business associate pursuant to HIPAA, and is subject to the same rules as Defendant Northwell. *Id.*

69.     Defendants are also regulated by the Health Information Technology Act ("HITECH").[18] See 42 U.S.C. §17921, 45 C.F.R. § 160.103.

70.     Because Defendants are covered by HIPAA (45 C.F.R. § 160.102), they are required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

71.     HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

72.     HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

73.     HIPAA requires Defendants to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

74.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

---

[18] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

75.     HIPAA's Security Rule requires Defendants to do the following:

a) Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b) Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c) Protect Against reasonably anticipated uses or disclosures of such information that are not permitted; and

d) Ensure compliance by its workforce.

76.     HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

77.     Moreover, the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

78.     Plaintiffs' and Class Members' Personal and Medical Information, including their PII and PHI, is "protected health information" as defined by 45 CFR § 160.103.

79.     45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

80.     45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

81.     Plaintiffs' and Class Members' personal and medical information, including their PII and PHI, is "unsecured protected health information" as defined by 45 CFR § 164.402.

82.     Plaintiffs' and Class Members' unsecured protected health information has been acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach.

83.     Plaintiffs' and Class Members' unsecured protected health information acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

84.     Plaintiffs' and Class Members' unsecured protected health information that was acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

85.     Plaintiffs' and Class Members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach.

86.     After receiving notice that they were victims of a data breach that required the filing of a Breach Report in accordance with 45 CFR § 164.408(a), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that future harm (including identity theft) is real and imminent, and to take steps to mitigate that risk of future harm.

87.     HIPAA requires covered entities and business associates to protect against reasonably anticipated threats to the security of sensitive patient health information.

88.     Covered entities and business associates must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

89.     This Data Breach constitutes an unauthorized access of PHI, which is not permitted under the HIPAA Privacy Rule:

A breach under the HIPAA Rules is defined as, "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40.

90.   The Data Breach could have been prevented if Defendants had implemented HIPAA mandated and industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients with respect to adequately securing and maintaining the confidentiality of Private Information.

91.   It can be inferred from the Data Breach that Defendants either failed to implement, or inadequately implemented, information security policies or procedures in place to protect Representative Plaintiffs' and Class Members' PII and PHI.

92.   Upon information and belief, prior to the Breach, Defendants were aware of their security failures but failed to correct them or adequately and timely disclose them to the public, including Plaintiffs and Class Members.

93.   The implementation of proper data security processes requires affirmative acts. Accordingly, Defendants knew or should have known that they did not make such actions and failed to implement adequate data security practices.

94.   Because Defendants failed to comply with industry standards, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is necessary to ensure Defendants' approach to information security is adequate and appropriate. Defendants still maintain the PII and PHI of Plaintiffs and Class Members; and without the supervision of the Court via injunctive relief, Plaintiffs' and Class Members' PII and PHI remains at risk of subsequent Data Breaches.

95.   In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency

with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Plaintiffs and Class Members.

96.     Defendants owed a duty to Plaintiffs and Class Members to ensure that the Private Information they collected and were responsible for was adequately secured and protected.

97.     Defendants owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including not sharing information with other entities who maintained sub-standard data security systems.

98.     Defendants owed a duty to Plaintiffs and Class Members to implement processes that would immediately detect a breach that impacted the Private Information it collected and was responsible for in a timely manner.

99.     Defendants owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

100.     Defendants owed a duty to Plaintiffs and Class Members to disclose if their data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to entrust this Private Information to Defendants.

101.     Defendants owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

102.     Defendants owed a duty to Plaintiffs and Class Members to mitigate the harm suffered by the Representative Plaintiffs' and Class Members' as a result of the Data Breach.

103.     Upon information and belief, Defendants' security failures include, but are not limited to:

    a. Failing to maintain an adequate data security system and safeguards to prevent data loss;

    b. Failing to mitigate the risks of a data breach and loss of data, including identifying internal and external risks of a security breach;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Defendants creates, receives, maintains, and transmits;

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights;

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

g. Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information;

h. Failing to protect against any reasonably-anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information;

j. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons; and

k. Retaining information past a recognized purpose and not deleting it.

### The Federal Trade Commission Defines Defendants' Conduct as Constituting Unfair or Deceptive Acts

104.    The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See e.g., FTC v. Wyndham Corp.*, 799 F.3d 236 (3d Cir. 2015).

105.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[19]

---

[19] https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf last visited January 18, 2024).

106.    The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, encrypt information stored on networks, understand its network's vulnerabilities, and implement policies to correct any security problems.[20]

107.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

108.    Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII constitutes an unfair act or practice.

109.    Defendants were at all times fully aware of their obligations to protect Plaintiffs' and Class Members' Private Information because of their business models of collecting and storing Private Information. Defendants were also aware of the significant adverse repercussions befalling healthcare recipients that would result from their failure to do so.

**Value of the Relevant Sensitive Information**

110.    Although they provide greater efficiency and cost savings for providers, electronic health records contain a plethora of sensitive information (e.g., patient data, patient diagnosis, lab results, RX's, treatment plans) that is valuable to cyber criminals seeking to access them. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PII and PHI and financial information are valuable commodities for which a "cyber black market" exists in which criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on a number of underground internet websites. Unsurprisingly, the healthcare industry is at high risk for and acutely affected by cyberattacks.

---

[20] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business last visited January 18, 2024.

111.    The high value of PII and PHI and financial information to criminals is further evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[21]  Criminals can also purchase access to entire company data breaches from $999 to $4,995.[22]

112.    Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[23] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[24] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03% of overall health data breaches, according to cybersecurity firm Tenable.[25]

113.    These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members. For example, it is believed that certain PII compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related benefits in the state of Oklahoma. Such fraud will be an omnipresent threat for Plaintiffs and Class Members for the rest of their lives. They will need to remain constantly vigilant.

114.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security

---

[21] Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-darkweb-how-much-it-costs/ last accessed January 31, 2024.

[22] In the Dark, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ last visited January 31, 2024.

[23] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133 last visited January 18, 2024.

[24] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ last visited January 18, 2024.

[25] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches last visited January 18, 2024.

number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

115.    Identity thieves can use PII and PHI and financial information, such as that of Plaintiffs and Class Members, which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain government benefits, or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

116.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII and PHI is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[26]

117.    The harm to Plaintiffs and Class Members is especially acute given the nature of the leaked data. Medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft. According to Kaiser Health News, "medical- related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[27]

---

[26] 47 Report to Congressional Requesters, GAO, at 29 (June 2007), available at: http://www.gao.gov/new.items/d07737.pdf last visited January 31, 2024.

[27] Michael Ollove, The Rise of Medical Identity Theft in Healthcare, KAISER HEALTH NEWS (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/ last visited January 31, 2024.

118.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[28]

119.    If cyber criminals manage to access financial information, health insurance information and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Defendants may have exposed Plaintiffs and Class Members.

120.    A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[29]  Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.[30]

121.    Data breaches are preventable.[31] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[32]  She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised."[33]

---

[28] *Id.*

[29] See Elinor Mills, Study: Medical Identity Theft is Costly for Victims, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ last visited January 31, 2024.

[30] Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One, EXPERIAN, available at https://www.experian.com/blogs/ask-experian/healthcare-data-breachwhat-to-know-about-them-and-what-to-do-after-one/ last visited January 31, 2024.

[31] Lucy L. Thompson, Despite the Alarming Trends, Data Breaches Are Preventable, in DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[32] *Id.*  at 17.

[33] *Id*. at 28.

122.    Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[34]

123.    The Data Breach resulted from a combination of insufficiencies that demonstrate how Defendants failed to comply with industry, standards, safeguards and concomitant duties established by HIPAA regulations.

***Loss of the Benefit of the Bargain***

124.    As a consequence of Defendants' inadequate data security systems and protection, Plaintiffs and Class Members have been deprived of the benefit of their bargain which occurred when they agreed to pay providers at hospitals or medical facilities owned by Defendants for the provision of healthcare services.   Plaintiffs and Class Members, reasonable consumers – understandably expected that they were, in part, paying for the service and necessary data security to protect the Private Information when, in fact, Defendants had not provided the necessary adequate data security in any event.  Consequently, Plaintiffs and Class Members received services that were of a lesser value than what they had reasonably expected from and bargained for with Defendant.

***Ongoing Need for Expensive Credit and Identity Theft Monitoring***

125.    Unquestionably there will be a future cost of credit and identify theft monitoring that will be necessary for Plaintiffs and Class Members' protection going forward as a consequence of the Data Breach and the sensitive Private Information that has been accessed.  The probability is strong that the stolen information will be used by criminals to accomplish crimes based on identity theft, including opening bank accounts and victims' names to make purchases or launder

---

[34] *Id.*

money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.  These fraudulent incidents may not be detected for years and individuals may not even know that they have yet occurred.

126.    Credit monitoring and identity theft monitoring is expensive.  The cost can run approximately $200 a year per each Class Member.  This cost is necessary and reasonable, for Plaintiffs and Class Members are now forced to monitor and protect themselves from identity theft going forward, and need to do so for many years.

### *Defendants' Inadequate Response to the Breach*

127.    Time is of the essence when highly sensitive PII and PHI is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired PII and PHI of Plaintiffs and Class Members is likely available, or may be available at any moment, on the Dark Web. Hackers can access and then offer for sale the unencrypted, unredacted PII and PHI to criminals. Plaintiffs and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their PII and PHI, especially their Social Security numbers and sensitive medical information, onto the Dark Web. Plaintiffs and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing millions of Medicare numbers, Social Security numbers, Dates of birth, and other critical PHI and/or PII.

128.    Despite this understanding, Defendants have not made adequate and timely written notice of the Data Breach to Plaintiffs and Class Members and has provided only scant details.

129.    Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.8% of U.S.-based workers are compensated on an hourly basis, while the other 44.2% are salaried.[35]

---

[35] U.S. BUREAU OF LABOR STATISTICS, Characteristics of minimum wage workers, 2021, available at https://www.bls.gov/opub/reports/minimum-wage/2021/pdf/home.pdf, last visited January 31, 2024; *see also*, Bureau of Labor Statistics, https://www.bls.gov/news.release/empsit.t19.htm, last visited January 31, 2024 (finding that on average, private-sector workers make $1,146.99 per 40-hour work week).

130.     According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;[36] leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[37] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

131.     Plaintiffs and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek remuneration for the loss of valuable time as another element of damages.

## I.     CLASS ALLEGATIONS

132.     Pursuant to Fed. R. Civ. P. 23.01, *et seq*., Plaintiffs assert common law claims, as more fully alleged hereinafter, on behalf of the following proposed Class, defined as follows:

> All individuals whose Private Information was accessed or otherwise acquired or compromised as a result of the Data Breach.

Members of the Class are referred to herein collectively as "Class Members" or "Class."

133.     Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

134.     **Numerosity**: The exact number of members of the Class is unknown to Plaintiffs at this time but Northwell provides services to millions of consumers and has acknowledged that the number of individuals affected by the Data Breach was approximately 3.9 million persons,

---

[36] See https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html last visited January 31, 2024.

[37] *Id.*

indicating that joinder of all members of the Class is impracticable.[38]  Ultimately, members of the Class will be readily identified through Defendants' records.

135.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a)    Whether Defendants failed to adequately safeguard Plaintiffs' and the Class Members' PII and PHI;

b)    Whether Defendants failed to protect Plaintiffs' and the Class Members' PII and PHI, as promised;

c)    Whether Defendants' computer systems and data security practices used to protect Plaintiffs' and the Class Members' PII and PHI violated state and local laws, or Defendants' duties;

d)    Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and the Class Members' PII and PHI properly and/or as promised;

e)    Whether Defendants violated the consumer protection statutes, data breach notification statutes, state unfair practice statutes, state privacy statutes, and state medical privacy statutes, HIPAA, and/or regulations, imposing duties upon Defendants, applicable to Plaintiffs and Class Members;

f)    Whether Defendants failed to notify Plaintiffs and members of the Class about the Data Breach as soon as practical and without delay after the Data Breach was discovered;

g)    Whether Defendants acted negligently in failing to safeguard Plaintiffs' and the Class Members' PII and PHI;

---

[38] https://www.beckershospitalreview.com/cybersecurity/northwell-faces-lawsuit-over-data-breach-affecting-3-9-million-people.html (last visited January 31, 2024).

h)      Whether Defendants entered into contracts with Plaintiffs and the Class Members that included contract terms requiring Defendants to protect the confidentiality of Plaintiffs' PII and PHI and have reasonable security measures;

i)      Whether Defendants' conduct described herein constitutes a breach of contracts with Plaintiffs and each of the Class Members;

j)      Whether Defendants should retain any money paid by Plaintiffs and each of the Class Members to protect their PII and PHI;

k)      Whether Plaintiffs and the Class Members are entitled to damages as a result of Defendants' wrongful conduct;

l)      Whether Plaintiffs and the Class Members are entitled to restitution as a result of Defendants' wrongful conduct;

m)      What equitable relief is appropriate to redress Defendants' wrongful conduct; and

n)      What injunctive relief is appropriate to redress the imminent and currently ongoing harm faced by Class Members.

136.    **Typicality**: Plaintiffs' claims are typical of the claims of each of the Class Members. Plaintiffs and the Class Members sustained damages as a result of Defendants' uniform wrongful conduct during transactions with them.

137.    **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and there are no defenses unique to Plaintiffs.  Plaintiff Ambrosio and her counsel are committed to prosecuting this action vigorously on behalf of the members of the proposed Class, and has the financial resources to do so. Neither Plaintiff Ambrosio nor her counsel have any interest adverse to those of the other members of the Class.

138.    **Separateness**: This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for the Defendants or would be dispositive of the interests of members of the proposed Class. Furthermore, the Private Information collected by Defendants still exists, and is still vulnerable to future attacks – one standard of conduct is needed to ensure the future safety of the PHI and PII collected, stored, and maintained by Defendants.

139.    **Class-wide Applicability**: This case is appropriate for certification because Defendants has acted or refused to act on grounds generally applicable to the Plaintiffs and proposed Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards members of the Class, and making final injunctive relief appropriate with respect to the proposed Class as a whole. Defendants' practices challenged herein apply to and affect the members of the Class uniformly, and Plaintiffs' challenge to those practices hinges on Defendants' conduct with respect to the proposed Class as a whole, not on individual facts or law applicable only to Plaintiff.

140.    **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the members of the Class. The injuries suffered by each individual member of the Class are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendants' conduct. Absent a class action, it would be virtually impossible for individual members of the Class to obtain effective relief from Defendants. Even if Class Members could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the common legal and factual issues presented here. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

## COUNT I

**Negligence**
**(On Behalf of Plaintiffs and the Class)**

141.    Plaintiff, on behalf of herself, her minor children, and the Class, re-alleges and incorporates the above allegations by reference.

142.    Plaintiffs and Class Members were required to submit PII and PHI to healthcare providers, including Defendants, in order to obtain insurance coverage and/or to receive healthcare services.

143.    Defendants knew, or should have known, of the risks and responsibilities inherent in collecting and storing the PII and PHI of Plaintiffs and Class Members.

144.    As described above, Defendants owed a duty of care to Plaintiffs and Class Members whose PII and PHI had been entrusted to Defendants.

145.    Defendants breached its duty to Plaintiffs and Class Members by failing to secure their PII and PHI from unauthorized disclosure to third parties.

146.    Defendants acted with wanton disregard for the security of Plaintiffs' and Class Members' PII and PHI.

147.    A "special relationship" exists between Defendants and the Plaintiffs and Class Members. Defendants entered into a "special relationship" with Plaintiffs and Class Members because it collected and/or stored the PII and PHI of Plaintiffs and the Class Members.

148.    But for Defendants' wrongful and negligent breach of their duty owed to Plaintiffs and the Class Members, Plaintiffs and the Class Members would not have been injured.

149.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duty.  Defendants knew or should have known it was failing to meet its duty, and that Defendants' breach of its duty would cause Plaintiffs and

Class Members to experience the foreseeable harms associated with the unauthorized exposure of their PII and PHI.

150.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT II

### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

151.    Plaintiff, on behalf of herself, her minor children, and the Class, re-alleges and incorporates the above allegations by reference.

152.    Defendants had a legal duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PII and PHI.

153.    Defendants breached its duty to Plaintiffs and Class Members by failing to implement reasonable safeguards to protect Plaintiffs' and Class Members' PII and PHI from unauthorized access.

154.    Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

155.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

156.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of its duty. Defendants knew or should have known that it was failing to meet its duty, and that Defendants' breach of that duty would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the unauthorized access to their PII and PHI.

157.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT III

### Breach of Implied Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiffs and the Class)

158.    Plaintiff, on behalf of herself, her minor children, and the Class, re-alleges and incorporates the above allegations by reference.

159.    Plaintiffs and Class Members entered into valid, binding, and enforceable express or implied contracts with entities affiliated with or serviced by Defendants, as alleged above.

160.    The contracts respecting which Plaintiffs and Class Members were intended beneficiaries were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform its contractual obligations (both explicit and fairly implied) and not to impair the rights of the other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the implied covenants that Defendants would act fairly and in good faith in carrying out its contractual obligations to take reasonable measures to protect Plaintiffs' PII and PHI from unauthorized disclosure and to comply with state laws and regulations.

161.    A "special relationship" exists between Defendants and the Plaintiffs and Class Members. Defendants entered into a "special relationship" with Plaintiffs and Class Members who sought medical services from Defendant Northwell and, in doing so, entrusted Defendants, pursuant to their requirements and their HIPPA Notice, with PII and PHI.

162.    Despite this special relationship with Plaintiff, Defendants did not act in good faith and with fair dealing to protect Plaintiffs' and Class Members' PII and PHI.

163.    Plaintiffs and Class Members performed all conditions, covenants, obligations, and promises owed to Defendants.

164.    Defendants' failure to act in good faith in complying with the contracts denied Plaintiffs and Class Members the full benefit of their bargain, and instead they received healthcare

and related services that were less valuable than what they paid for and less valuable than their reasonable expectations.

165.    Accordingly, Plaintiffs and Class Members have been injured as a result of Defendants' breach of the covenant of good faith and fair dealing respecting which they are express or implied beneficiaries, and are entitled to damages and/or restitution in an amount to be proven at trial.

## COUNT IV

### Breach of Duty
### (On Behalf of Plaintiffs and the Class)

166.    Plaintiff, on behalf of herself, her minor children, and the Class, re-alleges and incorporates the above allegations by reference.

167.    Defendants accepted the special confidence placed in them by Plaintiffs and Class Members.  There was an understanding between the parties that the healthcare service provider Defendants would act for the benefit of Plaintiffs and Class Members in preserving the confidentiality of their PII and PHI.

168.    Defendants became the guardian of Plaintiffs' and Class Members' PII and PHI and accepted a fiduciary duty to act primarily for the benefit of Defendants' patients, including Plaintiffs and the Class Members, including safeguarding Plaintiffs' and the Class Members' PII and PHI.

169.    Defendants' fiduciary duty to act for the benefit of Plaintiffs and Class Members pertains as well to matters within the scope of Defendants' medical relationship with its patients, in particular, to keep secure the PII and PHI of those patients.

170.    Defendants breached its fiduciary duty to Plaintiffs and Class Members by (a) failing to protect their PII and PHI to Plaintiffs and the Class; (b) by failing to notify Plaintiffs and the Class Members of the unauthorized disclosure of the PII and PHI; and (c) by otherwise failing to safeguard Plaintiffs' and the Class Members' PII and PHI.

171.    As a direct and proximate result of Defendants' breach of its fiduciary duty, Plaintiffs and/or Class Members have suffered and/or will suffer injury, including but not limited to: (a) the compromise of their PII and PHI; and (b) the diminished value of the services they received as a result of unauthorized exposing of Plaintiffs' and Class Members' PII and PHI.

172.    As a direct and proximate result of Defendants' breach of its fiduciary duty, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT V

### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

173.    Plaintiff, on behalf of herself, her minor children, and the Class, re-alleges and incorporates the above allegations by reference.

174.    Defendants collected and maintained responsibility for the Private Information of Plaintiffs and the Class, including, *inter alia*, name, Social Security Number, and other PHI in connection with the provision of services to Plaintiffs and the Class.

175.    At the time Defendants acquired the PII of Plaintiffs and the Class, there was a meeting of the minds and a mutual understanding that Defendants would safeguard the PII and not take unjustified risks when storing the PII.

176.    Plaintiffs and the Class would not have entrusted their PII to Defendants had they known that Defendants would fail to adequately safeguard their PII.

177.    Prior to the Data Breach, Defendants published its HIPAA Notice, agreeing to protect and keep PHI of Plaintiffs and the Class.

178.    Implicit in the agreement between Plaintiffs and Class Members and the Defendants to provide PII, was Defendants' obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access

and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

179.    In collecting and maintaining responsibility for the maintenance and protection of the PII of Plaintiffs and the Class and publishing the HIPAA Policy, Defendants entered into contracts with Plaintiffs and the Class requiring Defendants to protect and keep secure the PHI/PII of Plaintiffs and the Class.

180.    Plaintiffs and the Class fully performed their obligations under the contracts with Defendants.

181.    Defendants breached the contracts they made with Plaintiffs and the Class by failing to protect and keep PHI/PII of Plaintiffs and the Class.

182.    As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiffs and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; additional time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, credit freezes, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

183.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class are at an increased risk of identity theft or fraud.

184.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class are entitled to and demand actual, consequential, and nominal damages and injunctive relief, to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, her minor children, and the proposed Class, prays for relief and judgment against Defendants as follows:

A.      certifying the Class as defined herein, appointing Plaintiffs as representatives of the Class, and designating Plaintiff Ambrosio's counsel as Class Counsel;

B.      declaring that Defendants' conduct violates the laws referenced herein;

C.      finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.      awarding Plaintiffs and the Class compensatory damages and actual damages in an amount to be determined by proof;

E.      awarding Plaintiffs and the Class appropriate relief, including actual, nominal and statutory damages;

F.      awarding Plaintiffs and the Class punitive damages;

G.      awarding Plaintiffs and the Class civil penalties;

H.      granting Plaintiffs and the Class declaratory and equitable relief, including restitution and disgorgement;

I.      enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

J.      awarding Plaintiffs and the Class the costs of prosecuting this action, including expert witness fees;

K.      awarding Plaintiffs and the Class reasonable attorneys' fees and costs as allowable by law;

L.      awarding pre-judgment and post-judgment interest; and

M.      granting any other relief as this Court may deem just and proper.

## II.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

DATED:  February 2, 2024            Respectfully submitted,


            **BARRACK, RODOS & BACINE**

By:    By: /s/MICHAEL A. TOOMEY
            MICHAEL A. TOOMEY
            11 Times Square
            640 8th Ave., 10th Fl.
            New York, NY 10022
            Telephone: (212) 688-0782
            mtoomey@barrack.com

            **BARRACK, RODOS & BACINE**
            STEPHEN R. BASSER*
            SAMUEL M. WARD*
            600 West Broadway, Suite 900
            San Diego, CA  92101
            Telephone:  (619) 230-0800
            Facsimile:   (619) 230-1874
            sbasser@barrack.com
            sward@barrack.com

            **EMERSON FIRM, PLLC**
            JOHN G. EMERSON*
            2500 Wilcrest, Suite 300
            Houston, TX 77042
            Phone: 800-551-8649
            Fax: 501-286-4659
            jemerson@emersonfirm.com

            *Counsel for Plaintiff and the Putative Class*

            **Pro Hac Vice* application to be filed*